# IN THE COURT OF APPEALS OF IOWA

No. 22-0501
Filed June 7, 2023

**SCOTT POSTMA,**
        Plaintiff-Appellee/Cross-Appellant,

**vs.**

**DIANE WEDEBRAND, as Guardian and Conservator of MIKE KATS, ARVIN BRENNEMAN, HAROLD VANDER VLIET, and DIANE WEDEBRAND,**
        Defendants-Appellants/Cross-Appellees,

_____

        Appeal from the Iowa District Court for Sioux County, Patrick H. Tott, Judge.


        The defendants appeal the trial court's ruling in this declaratory judgment action finding Scott Postma is a shareholder of Ozone Solutions, Inc. and was entitled to notice of the meeting held on May 31, 2018.  Plaintiff cross-appeals the court's rulings on requests for sanctions, which we treat as a petition writ for certiorari.  **AFFIRMED ON APPEAL; WRIT SUSTAINED IN PART AND REMANDED.**


        Jeffrey T. Myers of Goosmann Law Firm and Angie J. Schneiderman of Moore Corbett Law firm, Sioux City, for appellants/cross-appellees.

        William G. Beck of Woods, Fuller, Shultz & Smith P.C., Sioux Falls, South Dakota, for appellee/cross-appellant.


        Heard by Bower, C.J., and Tabor and Greer, JJ.

**BOWER, Chief Judge.**

Diane Wedebrand, Mike Kats, Arvin Brenneman, and Harold Vander Vliet (collectively, the Defendants) appeal the trial court's ruling in this declaratory judgment action finding Scott Postma is a shareholder of Ozone Solutions, Inc. (Ozone) and was entitled to notice of the meeting held on May 31, 2018. Postma cross-appeals the court's rulings on his requests for sanctions.

Because Postma was a shareholder and received no notice for the May 31, 2018 meeting, the actions taken at that meeting are void. We affirm on the appeal.

We treat the cross-appeal as a petition writ of certiorari, grant the petition, and sustain the writ in part. We find no abuse of discretion in the trial court's determination sanctions were to be imposed upon Kats alone for the bad faith presentation of an affidavit under Iowa Rule of Civil Procedure 1.981(7). But, because the district court employed the wrong standard in determining whether sanctions should be imposed under rule 1.517(3)(b), we sustain the writ in part and remand for consideration under the correct standard.

**I. Background Facts and Proceedings.**

Prior to the formation of Ozone, Vander Vliet and Brenneman had started an ozone business. About a year later they met Kats who joined the business. During this time Kats developed an ozone system that he was using on his farm. Kats wanted an engineer to look at his ozone system and had his sister, Gina Kats, approach Postma while he was a senior at Dordt College majoring in mechanical engineering. After the conversation, Postma began researching ozone and ozone systems during his final semester of college and, after meeting with Kats, an

additional meeting was set up with Brenneman and Vander Vliet as possible investors.

Ozone was incorporated on April 15, 1997. The initial incorporators of the company were Kats, Postma, Brenneman, Vander Vliet, Randy Curry, and Mitch Gramstead.

At the organizational meeting of the shareholders and board of directors of the company on July 1, 1997, Kats was elected president of the company and Postma was elected as the secretary/treasurer. At this meeting a buy-sell agreement between the corporation and its shareholders was approved as were the corporate bylaws and stock certificate form; it was decided that the business would be a "Subchapter S" corporation. Ozone was located at 32 Sixth Street NW, Sioux Center, Iowa.

The terms of the buy-sell agreement approved at the July 1, 1997 meeting required a shareholder who wished to sell his shares to first offer those shares to the company and then to each of the other shareholders of the company on the terms set out in the agreement before being able to transfer the shares to a third party. It also provided the terms for the sale and purchase of the shares of a deceased shareholder. The buy-sell agreement did not contain any provisions under which a shareholder would be required to sell their shares or surrender their shares to the company. The bylaws of the company, among other things, established shareholder rights, created a board of directors, and designated officers for the company. The bylaws made no reference to the manner of acquiring or transferring ownership of shares of stock of the company. The bylaws did require notice to be given to all shareholders prior to any meetings or, in the

alternative, that the shareholders unanimously agreed in writing to certain action in lieu of a formal meeting. For board-of-director meetings, regularly scheduled annual meetings were to be conducted without any additional notice but, for special meetings, at least one day's notice was required to be given to all directors.

At the time of the filing of the Subchapter S election with the Internal Revenue Service in 1997, the only shareholders of Ozone were Kats, who held 7500 shares, and Postma, who held 2500 shares.

On June 21, 2018, Postma filed a petition for declaratory judgment seeking to void the actions taken by the Defendants at a corporate meeting held on May 31, 2018. That meeting involved the purchase of shares of Ozone owned by Brenneman and Vander Vliet, the issuance of a loan to Ozone by Wedebrand, a payment or issuance of shares by Ozone to Kats, and the forgiveness of debts to Ozone owed by Kats, Brenneman, and Vander Vliet.

On July 9, 2020, the district court found a number of facts were deemed admitted by the individual Defendants due to their failure to respond to Postma's requests for admissions, including that on January 1, 2013, Kats owned 5414 shares of Ozone, Postma owned 4296 shares, Brenneman owned 340 shares, and Vander Vliet owned 900 shares and, if called to testify, a custodian of records at the law offices of Oostra, Bierma, Van Engen & Mouw, P.L.C. would testify that Kats temporarily removed Ozone's corporate books and records on March 14, 2006, and permanently removed Ozone's books and records in 2009.[1]

---

[1] Defendants attempted to admit into evidence a promissory note dated May 8, 2003, which provides in part:

> The undersigned Scott Postma agrees to pay Ozone Solutions, Inc.
> at 789 7th Street NW Sioux City, Iowa 51250. The amount of

A trial to the court was held on October 13-15, 2020, and April 22, 2021. Postma argued that he remained a shareholder of Ozone as of May 31, 2018, and as shareholder he was entitled to notice of the May 31 meeting and maintained the right to vote on the agenda items. Because he had no notice, the actions taken at that meeting were void.

For their part, the individual defendants asserted Postma was required to sell his 4296 shares back to Ozone after his employment was terminated in 2013 (pursuant to the 2003 transaction). The trial court made extensive findings of fact—all of which are fully supported by the record before us.

> (6) Kats testified that Ozone conducted regular shareholder and directors' meetings pursuant to the company bylaws. He indicated that there were both formal and informal meetings and that minutes of each meeting were taken by hand during the meetings with formal typed minutes prepared which were approved at the next meeting. Postma was the secretary of Ozone from 1997 to 2004 or 2005 and was responsible for preparing and recording these minutes. Brad Kats became the secretary in 2005 and Nic Van Engen later succeeded Brad as the secretary of the company.
> (7) Over the first four or five years after Ozone was formally established, Postma worked on additional research on the ozone systems and did extensive travel to visit farmers about the system as well as to several major universities to try to get them involved in researching the ozone systems. Ultimately Michigan State University agreed to install one of Ozone's ozone systems at the university and to conduct research on the same. During this time Ozone moved to 653 1st Ave NE, Sioux Center, Iowa.
> (8) During this time Postma was to receive a salary of $25,000 per year which would be paid in either cash or shares of Ozone stock. Postma indicated that he took little pay as cash and primarily tried to

---

$16,389.12 for 3201 Shares at $5.12 a Share. These 3201 shares and all remaining unpaid equity is to be returned to Ozone Solutions Inc. at any time that Mr. Postma[] decides to leave for voluntary reason or his employment is terminated.

Kats contended the promissory note reflects Postma's agreement to return his shares to the company if he left the employment of the company. The trial court found his contention contradicted by other evidence in which Kats and others acknowledge that Postma's early shares were earned by sweat equity.

build up his share equity in Ozone. Internal corporate records would indicate that as of November 31, 2002, Postma had accumulated 5466 shares of Ozone stock.

(9) Shortly after October 8, 2003, Ozone moved to its third physical location at 789 7th St. NW, Sioux Center, Iowa. Ozone made its first rent payment for this location on November 3, 2003. Ozone moved to this location after sales started to pick up and a larger space was needed. At an informal meeting of the shareholders and directors of Ozone on November 13, 2003, a distribution of 3201 shares of stock was authorized to Postma. At this time Kats also received 3417 shares after converting his loan for his pickup and equipment into shares.

(10) On February 17, 2005, Lloyd Bierma who was the attorney for Ozone sent a letter to Kats and Postma setting out the stock ownership of Ozone as of that time. Mr. Bierma's records indicated that as of February 17, 2005, Kats owned 6767 shares; Postma owned 4500 shares[2]; Mitch Gramstead owned 1110 shares; Vander Vliet owned 1125 shares; and Brenneman owned 425 shares.

(11) As Ozone continued to grow, discussions were held about letting new employees buy into the company. By that time Joel Leusink, Brad Kats, and Adam Bradshaw had been hired as employees of Ozone. At an informal meeting of the board of directors and shareholders of Ozone on December 31, 2005, it was agreed that existing shareholders would sell 20% of their existing shares back to the company and that the employees of the company would then be able to purchase those shares. As a shareholder, Postma was also able to purchase these shares. After the transaction was completed, Postma held 4296 shares and Joel Leusink, Brad Kats, and Adam Bradshaw each held 696 shares respectively. As a condition for the purchase of these shares, the new "shareholder employees" had to agree to sign a Customer Non-Compete Agreement and a Stock Buy-Sell Agreement. The shares issued pursuant to this arrangement would have full voting rights as of January 1, 2006. Joel Leusink, Bradley Kats, and Adam Bradshaw signed an "Addendum to the Agreement to Buy and Sell Stock" and agreed to join and consented to the terms of the Buy-Sell Agreement dated July 1, 1997. Postma's percentage ownership of Ozone went from 32.31134% in 2005 to 31.63942% in 2006 as is reflected in the 2005 and 2006 K-1's from Ozone received by Postma.[3]

---

[2] Bierma's letter indicated that Postma's shares were acquired as follows: 1000 shares on July 1, 1997; 299 shares on August 26, 1998; and 3201 shares on November 13, 2003.

[3] A "K-1" is an IRS schedule used to report a partner's share of income, deductions, credits, and other items. *Partner's Instructions for Schedule K-1 (Form 1065)*,

(12) Postma's percentage ownership interest in Ozone ranged from 31.29% to 33.4538% between 2007 and 2013 as shown on the Ozone K-1's issued to him those years. Each year during this period Postma had income reported to him on each K-1 for which he paid income taxes.

(13) In August 2008, Ozone moved its physical location to 439 Black Forest Road, Hull, Iowa, as the company had outgrown the 7th Street facility.

(14) In 2013, Kats, Vander Vliet, and Brenneman had decided that they wanted to allow Brenneman's shares to be jointly owned with his wife Lorna and that the three of them wanted to purchase Mitch Gramstead's shares in the company without offering those shares first to the company or to the other shareholders pursuant to the Buy-Sell Agreement. Postma indicated that he was not in agreement with either of these items. On July 19, 2013, Kats, Vander Vliet, and Brenneman met with Postma and told him that they were going to give him a two-week break. Postma indicated that he sat by for a month or two thinking they would let him back into the operation of Ozone but that this never happened. After it became clear to Postma that the other owners of Ozone were not going to let him back into the day-to-day operations of the business, Postma started his own ozone company called Big Foot Ozone LLC. In essence, Postma was terminated from his employment with Ozone effective August 2013. Kats indicates that he fired Postma in 2013 for what he described as "lack of performance" but did not provide any specific details.

(15) In response to Postma forming Big Foot Ozone LLC, sometime around October 21, 2013, Ozone caused to be drafted a Petition for Temporary and Permanent Injunction which sought to enjoin Postma and Big Foot Ozone LLC from competing with Ozone. A draft of said petition was forwarded to Postma but apparently the petition was never filed. At paragraph 4 of the petition it asserts that Postma as a stockholder and former employee of Ozone owns roughly 30% of the outstanding shares of Ozone. As a result of the threatened lawsuit, Postma indicated that he gave up Big Foot Ozone and decided to wait things out a bit. During this time, Kats indicated that then counsel for Ozone, Scott Rhinehart, requested copies of the corporate records for the company and it was discovered that the corporate records from 1997 to 2013 were missing.

(16) On November 19, 2013, Postma received an email from Brad Kats in which Brad forwarded an email Mike Kats had sent earlier that day to four other persons including Brad, Joel Leusink and Lorna Vander Vliet. The email sent by Mike Kats included two

Department of the Treasury, Internal Revenue Service (Jan. 17, 2023), https://www.irs.gov/pub/irs-pdf/i1065sk1.pdf.

proposed amendments to Ozone's [1997] Buy and Sell Agreement. The first proposed amendment would require the sale of any shares in the company to be first offered in equal shares to Kats, Vander Vliet, and Brenneman. The second proposed amendment indicated that should an employee shareholder be terminated without cause, that the employee would have to surrender their shares to the company and be paid out at the current value for those shares. If an employee was terminated with cause, they would likewise have to surrender their shares but they would receive no pay-out for their shares unless it was approved by a majority of the remaining shareholders.

(17) On December 6, 2013, Postma, along with five other individuals, received an email from Kats regarding a special shareholders meeting to be held on December 16, 2013. This email set forth the agenda and items to be voted on, which included resolutions to approve the following:

(a) to allow joint ownership of Harold's stock in Ozone by Harold and Lorna;

(b) to allow Kats, Brenneman, and Vander Vliet to purchase Mitch Gramstead's shares in Ozone;

(c) to define who the attorneys for Ozone are;

(d) whether the corporation should relinquish and redeem the corporate shares of Postma;

(e) whether the shares redeemed from Postma be offered to Kats, Brenneman, and Vander Vliet;

(f) to authorize legal action against Postma to recover Postma's shares of Ozone;

(g) to authorize legal action to recover corporate documents from Postma.

(18) Prior to the December 16, 2013 meeting, Postma received an email from Joel Leusink, which had attached to it an email received from the De Koster law firm to Ozone. Said letter warned Ozone that actions proposed to be taken at the December 16th meeting may be in violation of the law as they were not aware of any corporate documents that would require a shareholder to sell their shares back to the company and that other proposed transactions were not in compliance with Ozone's 1997 Buy-Sell Agreement. As a result, the De Koster law firm advised that the taking of such action could result in Ozone having liability for damages to Postma. A copy of this letter was given to all shareholders of Ozone.[4]

---

[4] De Koster Law Firm was terminated by Ozone in April 2014. Phil De Koster testified that he believed the primary reason his firm was terminated was that Kats wanted "baseless" claims advanced against certain persons and that Kats would need to find new counsel for Ozone as a result.

(19) A shareholder meeting was held on December 16, 2013. At that meeting Kats, Vander Vliet, and Brenneman voted in favor of all the proposed resolutions listed in paragraph 17 above. Postma voted against all the resolutions and the three remaining shareholders voted against all of the resolutions except the one allowing Harold and Lorna to jointly own Harold's shares in Ozone.

(20) On February 18, 2014, Postma received an email from Lorna Vander Vliet with the agenda for the February 20, 2014 Board of Directors meeting attached. Said agenda included, among other things, the dividend distribution schedule and the percentage of profits to be distributed as dividends. The agenda included Postma as a voting participant in the meeting.

(21) During 2014, Brad Kats and Nic Van Engen quit as employees of Ozone and voluntarily sold their shares back to the company. In all, a total of four shareholder/employees left Ozone over time and all four voluntarily sold their shares back to the company. . . .

(22) On or about May 15, 2014, Postma received a letter from Marc Cord III who was acting as the corporate attorney for Ozone. In the May 15, 2014 letter, Postma was advised that a special meeting of the shareholders of Ozone had been scheduled for June 9, 2014. Included with the letter was a notice of the June 9, 2014 meeting which indicated that the purpose of the meeting was to vote on a proposed amendment to Ozone's bylaws to reduce the number of board members to three, with the three remaining board members being Kats, Brenneman, and Vander Vliet.

(23) On March 12, 2015, a shareholder meeting was held at which Postma did attend. Per the minutes of this meeting, Postma was elected to the Board of Directors.

(24) On June 16, 2015, Postma received an email from Lorna Vander Vliet informing him, as well as Kats and Brenneman, that a shareholders meeting had been rescheduled for June 23, 2015, to discuss shares of the company.

(25) On February 22, 2016, a shareholders meeting was purportedly held, although the only persons participating were Kats, Brenneman, and Vander Vliet. Minutes of this meeting reflected discussion of missing corporate records, the removal of Postma as a director, and the need to resolve shareholder disputes primarily dealing with Postma.

(26) On August 4, 2016, another purported shareholders' meeting was held which again was only attended by Kats, Brenneman, and Vander Vliet. The minutes of this meeting reflect that the purpose for the meeting was to attempt to resolve the ownership termination and payout to Postma. The minutes indicated that a payout of $378,250 to Postma had been unanimously approved at the August 14, 2015 meeting and that as of August 4, 2016, Postma had not deposited the $378,250 payout. The minutes

also indicated that it was approved to "update all buy-sell and corporate books" to alleviate any and all past misunderstandings. The minutes [signed only by Kats] also reflected that Postma's "board positions or any involvement are now voted unnecessary in any obligation and unanimously voted to be completely terminated."

(27) Despite these minutes of action by the shareholders, Postma received a K-1 from Ozone for tax year 2016 showing Postma to have a 39.23431% ownership interest in Ozone and distributing income to him.

(28) On February 10, 2017, Postma received an email from Kats regarding Kats' dissolution of marriage from his former wife Lorinda. Per the email, Kats indicated to Postma that he would have to be responsible, along with Vander Vliet and Brenneman, to pay over 50% of his alimony obligation because of Postma's testimony in his divorce. In November 2019, Kats wrote a check on Ozone's account at American State Bank for $51,600.22 to his ex-wife for payment of alimony and attorney fees through December 2018. The bank contacted Kevin York, the CEO of Ozone, prior to cashing the check.

(29) The 2017 and 2018 K-1's received by Postma continued to show his ownership interest in Ozone at 39.23431% and continued to distribute income to him.

(30) On May 1, 2018, Brenneman executed an "Offer to sell owner equity of Ozone Solutions." This offer stated Brenneman's desire to sell 100% of the shares of Ozone owned by him. His offer specifically stated that "[A]ll transfer of stock must be done in compliance within the current rules outlined within the Agreement to Buy and Sell Stock, dated July 1, 1997." The offer then provided Ozone with the right to exclusively buy his shares for the 30-day period after May 1, 2018. The offer further provided that should Ozone not exercise its rights within [thirty] days to buy his shares, he requested that each shareholder exercise their right to purchase pursuant to the Agreement to Buy-Sell Stock.

(31) Ozone issued Board of Director Minutes for a special meeting of the board of directors held on May 31, 2018. Postma was not invited to nor given notice of this meeting. At this meeting the board of Ozone purportedly approved the purchase of the shares of Vander Vliet and Brenneman by Ozone, to accept a loan from Diane Wedebrand to assist in paying for Brenneman's shares and to pay Kats a consulting fee of $5000 per month from Nov[ember] 2017 to June 2018. The minutes from this purported meeting were signed on June 5, 2018, by Kats, Vander Vliet, and Brenneman. After this meeting Ozone did in fact purchase the shares of Brenneman and entered into the loan agreement with Wedebrand to fund the purchase of those shares.

(32) On September 20, 2018, counsel for Postma received an email from Ozone corporate counsel indicating that American State

Bank was demanding that Postma provide certain identifying information as a person with a greater than 20% ownership interest in the company to extend the company's operating loan. In response to this email, Postma provided the requested information. American Bank also sought additional clarification as to the ownership of Ozone in light of the purported sale of Brenneman's stock to the corporation.

(33) On November 8, 2018, Kevin York, the manager for Ozone, sent an email to Postma and others regarding a Special Shareholders Meeting to be held on November 27, 2018. Attached to the email was a "Call and Notice" for said meeting. The notice provided that the purpose of the meeting was to determine the current members of the board since the redemption of Brenneman's shares, to discuss reformation of the current Agreement to Buy and Sell dated July 1, 1997, and to discuss litigation options against Postma. Postma testified that he was at the location for this meeting but was not allowed to attend.

(34) Kats, Vander Vliet, and Brenneman signed a "Resolution Adopted by the Board of Directors of Ozone Solutions, Inc." on November 9, 2018. Said resolution indicated that the Board of Directors of Ozone had confirmed the company's right to reacquire and redeem outstanding shares of employee-owners once employment with the company ended. The resolution further provided that the company elected to exercise that right as it related to Postma's shares and authorized the company to demand the relinquishment of Postma's shares and authorized the company to accept a loan from Vander Vliet in the amount of $206,752.00 to facilitate the reacquisition of Postma's shares. As a result of this resolution, Ozone advised American State Bank that Postma was no longer a shareholder of Ozone and that Postma would no longer receive K-1's from the company. American State Bank did not accept that explanation and indicated that it still viewed the situation regarding Postma's ownership of stock as being unresolved.

(35) A new CPA, Matthew Kelderman, performed the corporate tax returns for Ozone. Kelderman had previously done accounting and tax work for Kats. For the 2018 Ozone corporate return, Postma was issued a "Final K-1" showing ordinary business income of $7887.00. Said return also reflected loans from shareholders; in particular, a loan from Vander Vliet to the company to fund the buyout of Postma's shares. Mr. Kelderman indicated that Postma's K-1 was issued as a Final K-1 as corporate counsel for Ozone had advised him that Postma's shareholder rights had been terminated.

(36) Ozone's CPA, Todd Van Bruggen, testified that he did the corporate tax returns for Ozone through 2017. Based on his representation of the company, he testified that he was not aware of any agreement regarding what happened if a shareholder left the

company other than the original 1997 Buy-Sell Agreement. He testified that he was aware that efforts had been made to amend the Buy-Sell Agreement through his review of materials from Ozone's counsel but had never been advised that any amendments had been approved.

The trial court found "overwhelming" evidence Postma continued to own 4296 shares of Ozone stock on May 31, 2018, and the 1997 buy-sell agreement did not contain any provisions requiring a shareholder to sell or surrender their shares.

The court rejected the Defendants' assertion that at the time Postma acquired 3201 shares of stock in 2003, he agreed to sell his shares back to the company if he decided to leave the company for any reason or his employment with the company was terminated. The court explained:

> The individual defendants assert that this agreement was set forth in a purported Promissory Note dated May 3, 2003, in which they claim funds were "loaned" to Postma by Ozone for his purchase of 3201 shares, the note purportedly being signed by Kats and Postma. . . . [T]he Court finds this assertion of the individual defendants not credible. While Postma admits to receiving a check for $16,389.12 from Ozone at this time and that he returned the same amount to Ozone a few days later, that does not overcome the highly suspicious circumstances surrounding the "discovery" of this note during these proceedings and the numerous inconsistencies involving the note discussed [previously]. . . . [I]t is much more likely that the exchange of the checks was simply a paper trail to reflect the value of Postma's "sweat equity" that he had used to acquire ownership interest in the company during the early years. It also appears that these 3201 shares were not actually issued by Ozone to Postma until November 2003, six months after the purported Note.
>
> Even if the Promissory Note was a valid transaction, the Promissory Note is not an amendment to the 1997 Agreement to Buy and Sell Stock. For any amendment to that agreement to be valid, it must be agreed to by all of the persons who held stock at the time of the amendment to the agreement. As indicated above, even if the Promissory Note was valid, it was only signed by Kats and Postma and as such did not include all of the existing shareholders at that time as would be required to effectively amend the Buy-Sell Agreement.

The court found the actions taken at the May 31, 2018 board of directors meeting "were self-serving actions that directly benefit the three members of the board." Particularly noted were the price of the shares authorized, the terms of payout, and the payment of "consulting fees" to Kats. The court concluded, "As self-dealing transactions, the resolutions should have also been approved by the shareholders of the company."

The court explained:

Brenneman and Vander Vliet were having their shares purchased by the company at a price in excess of the last determined share price made by the shareholders. Section 3 of the 1997 Agreement to Buy and Sell Stock provided that the value of the stock would be determined at each annual meeting of the shareholders. Last share price so determined was $150 per share at the stockholder meeting held on March 12, 2015. As such, the purported sale price of $170 per share had not been previously established by the shareholders as required by the Agreement to Buy and Sell Stock. . . . As Postma was a shareholder he should have been involved in the decision making as to what the proper share price for the stock should have been.

The resolutions were further self-serving in that the payout approved for Brenneman's shares called for an immediate payment of the full $57,800 sale price while Vander Vliet was to be paid in full within 60 days. The terms of the Agreement to Buy and Sell Stock provided that if insurance proceeds were not available to pay the purchase price, 20% would be paid at the time of closing and balance would be paid out in not more than four equal annual installments, the first of which was to be paid one year after the closing. . . .

Further self-dealing involved in the May 31, 2018 resolution involves the payment of "consulting fees" to Kats of $5000 a month for the months of November 2017 to June 2018. Also Kats, Brenneman and Vander Vliet forgave any debts owed by them to Ozone. All of these actions affect the financial health of the company and as a result would have a direct impact on the shareholders of the company.

The trial court provided this declaratory ruling:

(1) That Postma is the owner of 4296 shares of stock of Ozone Solutions, Inc. and was an owner thereof on May 31, 2018.

(2) That the following actions taken by Ozone in reliance on the resolutions "approved" by the Board of Directors on May 31, 2018 are void:

A. Accepting the offer to purchase the shares offered for sale from Vander Vliet and Brenneman to Ozone Solutions, Inc.

B. Paying Brenneman on June 5, 2018, $170 a share for his 340 shares for a total of $57,800.

C. Accepting a loan from Diane Wedebrand for $57,800 to pay for Brenneman's shares.

D. Entering a loan agreement with Wedebrand.

E. Paying Vander Vliet on before July 31, 2018, $170 a share for his 900 shares for a total of $153,000.

F. Paying Kats consulting fees of $5000 per month for the period of November 2017 to June 2018.

G. All financial debts due to Ozone from Brenneman, Vander Vliet, and Kats are forgiven purportedly in exchange for the work and services they have performed for the company.

The court imposed a sanction pursuant to Iowa Rule of Civil Procedure 1.981(7) against Kats only "for the bad faith presentation of the affidavits at summary judgment claiming the validity of the Promissory Note as well as additional expenses incurred to combat said assertion at trial." The court declined to impose any sanction pursuant to rule 1.517(3)(b).

The Defendants appeal, and Postma cross-appeals.

On their appeal, the Defendants assert the trial court erred in finding Postma was entitled to notice of the May 31, 2018 meeting, Postma is barred by laches from claiming he was entitled to notice, the court abused its discretion in not accepting as credible evidence two exhibits—the purported May 2003 Promissory Note and unsigned minutes of a June 19, 2006 meeting of directors and shareholders, and the court erred in concluding the buy-sell agreement was not otherwise modified by Ozone's course of dealing with other employees.

On cross-appeal, Postma contends the court erred in not assessing fees as a sanction against Wedebrand and Vander Vliet for their "sham" affidavits in support of the "discovered" Promissory Note. He also asserts the court employed the wrong standard in ruling on his motion for sanctions under Iowa Rule of Civil Procedure 1.517(3)(b).

**II. Scope and Standard of Review.**

"Our standard of review in a declaratory judgment action usually depends on how the case was tried in the district court." *McNaughton v. Chartier*, 977 N.W.2d 1, 8 (Iowa 2022). Both sides assert our review is for correction of errors at law; the court ruled on objections. We agree with the parties that this action was tried at law; so we are bound by the district court's findings of fact if supported by substantial evidence. *Grinnell Mut. Reins. Co. v. Recker*, 561 N.W.2d 63, 68 (Iowa 1997). "Evidence is substantial if reasonable minds would find it adequate to reach a conclusion." *Id.* But we are not bound by the district court's conclusions of law, and "we may inquire into whether the court's ultimate conclusions were materially affected by improper conclusions of law." *Id.* We give weight to the trial court's findings when it comes to the credibility of witnesses. *City of Cedar Rapids v. Leaf*, 923 N.W.2d 184, 196 (Iowa 2018).

**III. Discussion.**

**A. Appeal.**

*1. Laches.* The Defendants assert that Postma should not be allowed to bring his claim on the equitable doctrine of laches. "Laches is an equitable doctrine premised on unreasonable delay in asserting a right, which causes disadvantage or prejudice to another." *First Fed. Sav. & Loan Ass'n v. Blass*, 316 N.W.2d 411,

414 (Iowa 1982). "The party asserting the defense has the burden to establish all of the essential elements thereof by clear, convincing, and satisfactory evidence. Prejudice is an essential element of laches." *Id.* at 414–415 (internal citation omitted). "Prejudice cannot be inferred merely from the passage of time." *Cullinan v. Cullinan*, 226 N.W.2d 33, 36 (Iowa 1975).

Defendants note, "[Postma] did not receive any notices of shareholder meetings even though he knew meetings were taking place and the company was still operating" and Postma did not request he be provided notice. They claim they were "entitled to rely on their belief that [Postma] did not want to receive notice."

They are wrong. Defense counsel acknowledged at trial that the bylaws require notice be given. Ozone was required to provide notice to its shareholders. As the trial court noted, a shareholder does not have to request notice when they are entitled to it under the corporation's bylaws. The parties were not functioning under an informal relationship, and the Defendants cannot evade the corporate bylaws when it is convenient for them.

*2. Proffered exhibits.* The defense asserts the court abused its discretion in rejecting their proposed exhibits with which they attempted to prove the 1997 buy-sell agreement had been amended. "We review evidentiary rulings for an abuse of discretion[, that is,] when the trial court exercises its discretion in grounds clearly untenable or to an extent clearly unreasonable." *See In re Condemnation of Certain Rights in Land*, 974 N.W.2d 103, 111 (Iowa 2022) (internal quotation marks and citation omitted).

The court noted, and the Defendants acknowledge, "The bylaws did require notice to be given to all shareholders prior to any meetings or in the alternative that

the shareholders unanimously agreed in writing to certain action in lieu of a formal meeting."[5]

"The 'Best Evidence' rule requires production of original documents unless their absence is sufficiently explained." *State v. Khalsa*, 542 N.W.2d 263, 268 (Iowa Ct. App. 1995); *see* Iowa R. Evid. 5.1002 ("An original writing, recording, or photograph is required to prove its content . . . ."). With respect to a purported 2003 amendment via the promissory note, the Defendants claim the proffered exhibit is a "duplicate promissory note in place of the lost original." Iowa Rule of Evidence 5.1001(e) states: "A 'duplicate' means a counterpart produced by a mechanical, photographic, chemical, electronic, or other equivalent process or technique that accurately reproduces the original." The proffered exhibit is not a duplicate. Kats testified the exhibit was a November 2003 recreation of a purported transaction several months prior—on May 8, 2003, which he prepared "to clarify the paper trail of the checks for $16,389.12 and a loan that I gave to Ozone Solutions for $17,000."

The trial court expressed significant concern for the authenticity of the proffered document in light of the "highly suspicious circumstances surrounding the 'discovery' of this note during these proceedings." It found the proposed exhibit lacked sufficient credibility to be received. It specifically found the individual

---

[5] *See* Iowa Code § 490.732(2) (2022) ("An agreement authorized by this section shall satisfy all of the following requirements: (a) Be as set forth in any of the following: (1) The articles of incorporation or bylaws and approved by all persons who are shareholders at the time of the agreement. (2) A written agreement that is signed by all persons who are shareholders at the time of the agreement and is made known to the corporation. (b) Be subject to amendment only by all persons who are shareholders at the time of the amendment, unless the agreement provides otherwise.").

defendants' assertion that the 2003 promissory note amended the 1997 buy-sell agreement was "not credible." The trial court did not abuse its discretion in rejecting the exhibit.

The Defendants also contend the court erred in concluding the buy-sell agreement was not amended by a June 2006 shareholder meeting, relying on "unsigned minutes of the June 19, 2006" meeting to support this claim. The trial court did not admit the proposed exhibit, noting:

> Kats asserts that in June 2006 a meeting of shareholders was held to amend the company Buy-Sell Agreement to address what would happen if shareholder employees were to leave their employment. Kats testified that the meeting was specifically to address employee Adam Bradshaw. Likewise, Vander Vliet and Brenneman testified that they remember discussions involving buy-sell terms in 2005 or 2006, although their recollection of specifics was very limited. It is likely [they were] recalling the discussions involving the new employee shareholders at that time. In any event, no written records of this meeting were produced nor was evidence of notice of the meeting to substantiate what was discussed or voted on at any such meeting.

The trial court concluded, "[N]o credible evidence has been presented to indicate that the original 1997 Agreement to Buy and Sell Stock has ever been effectively amended." We agree. The reasons provided by the trial court in rejecting the Defendants' proposed exhibits are neither unreasonable nor untenable.

*3. Course of dealing.* Defendants also assert they can show the buy-sell agreement was amended by course of dealing with other employee-shareholders. Defendants offer no authority for this claim. *See* Iowa R. App. P. 6.903(2)(g)(3) ("Failure to cite authority in support of an issue may be deemed waiver of that issue."). By failing to cite authority, Defendants have waived this claim.

**B. Cross-appeal.**[6]

In his post-trial brief to the trial court, Postma complained Defendants'
failure to admit certain facts and their presentation of "sham" affidavits supported
his request that sanctions be imposed against all individual defendants pursuant
to Iowa Rules of Civil Procedure 1.981(7)[7] and 1.517(3)(b).[8]  Postma contends the
court erred in imposing sanctions only on Kats under rule 1.981(7).   He also
contends the court employed the wrong standard in ruling on his request for
sanctions under rule 1.517(3)(b).

We treat this [cross-]appeal as a petition for writ of certiorari.
*Everly v. Knoxville Cmty. Sch. Dist.,* 774 N.W.2d 488, 492 (Iowa

---

[6] Defendants have filed no response to Postma's cross-appeal.  That failure does
not entitle Postma to reversal as a matter of right.  *See Bowen v. Kaplan*, 237
N.W.2d 799, 801 (Iowa 1976).  However, we confine our consideration to issues
raised in Postma's cross-appeal. *See id.*  We will not search the record for a theory
upon which to affirm the trial court.  *Id.*

[7] Rule 1.981(7) provides:
    *Affidavits made in bad faith.* Should it appear to the
    satisfaction of the court at any time that any of the affidavits
    presented pursuant to this rule are presented in bad faith or solely
    for the purpose of delay, the court shall forthwith order the party
    employing them to pay to the other party the amount of the
    reasonable expenses which the filing of the affidavits caused that
    party to incur, including reasonable attorney's fees, and any
    offending party or attorney may be adjudged guilty of contempt.

[8] Rule 1.517(3)(b) provides:
    *Expenses on failure to admit.* If a party fails to admit the
    genuineness of any document or the truth of any matter as requested
    under rule 1.510, and if the party requesting the admissions
    thereafter proves the genuineness of the document or the truth of the
    matter, the requesting party may move for an order requiring the
    other party to pay the reasonable expenses incurred in making that
    proof, including reasonable attorney's fees.  The court shall make the
    order unless it finds any of the following:
        (1) The request was held objectionable pursuant to rule 1.510.
        (2) The admission sought was of no substantial importance.
        (3) The party failing to admit had reasonable grounds to
    believe that the party might prevail on the matter.
        (4) There was other good reason for the failure to admit.

2009) ("The proper means to review a district court's order imposing sanctions is by writ of certiorari."); *see* Iowa R. App. P. 6.108. "We review a district court's order imposing sanctions under our rules of civil procedure for an abuse of discretion." *Rowedder v. Anderson*, 814 N.W.2d 585, 589 (Iowa 2012). A district court abuses its discretion when it "exercises its discretion on grounds or for reasons clearly untenable or to an extent clearly unreasonable." *Id.* [(citation omitted)]. "An erroneous application of the law is clearly untenable." *Id.*

*First Am. Bank v. Fobian Farms, Inc.*, 906 N.W.2d 736, 744 (Iowa 2018).

*1. Rule 1.981(7) sanction against Kats only.* In its final ruling, with respect to the affidavits the trial court ruled:

> [I]mposition of sanctions pursuant to Rule 1.981(7) would be appropriate for the bad faith presentation of the affidavits at summary judgment claiming the validity of the Promissory Note as well as additional expenses incurred to combat said assertion at trial. The court specifically finds that said sanctions should be imposed upon Kats in his individual capacity as it appears clear to the court that he was the driving force behind this activity and that to impose sanctions against Ozone Solutions, Inc. would only cause to harm the shareholders in general, including Postma. As no affidavit regarding attorney fees incurred by Postma has been presented to the court at this time, the court finds that a hearing should be set to determine the amount of the sanction to be imposed against Kats under rule 1.981(7).

While Postma's brief sought sanctions on all individual defendants, his complaints mentioned only Kats's conduct, Kats's affidavit, and Lorna Vander Vliet's affidavit. Postma's post-trial brief states, "[T]he court should fashion a sanction commensurate with the seriousness and magnitude of the misconduct." The court did what was requested; it fashioned a sanction it found commensurate with misconduct.

Rule 1.981(7) states, "Should it appear to the satisfaction of the court at any time that any of the affidavits presented pursuant to this rule are presented in bad faith or solely for the purpose of delay, the court shall forthwith *order the party*

*employing them* to pay to the other party the amount of the reasonable expenses . . . ." (Emphasis added). Giving weight to the trial court's finding that Kats was the "driving force" behind the sanctionable conduct, we cannot conclude it exercised its discretion on grounds or for reasons clearly untenable or to an extent clearly unreasonable in imposing sanctions on Kats alone.

*2. Rule 1.517(3)(b).* Postma requested the individual defendants admit three requests, which he contends would have obviated the need for trial. He asserts the individual defendants refused to admit: (1) the buy sell was a complete and correct copy of the buy sell agreement, (2) the buy sell agreement governs transfer of stock, and (3) none of the individual Defendants provided Postma "notice of the meeting of Mike Kats, Arvin Brenneman, and Harold Vander Vliet that took place on or about May 31, 2018."

The court concluded:

In this case there was no objections raised to the requests for admission and the requests dealt with matters of substantial importance to this litigation. However, there was at *least a colorable basis for the denials* made regarding whether the 1997 Agreement was the full agreement as it does appear that some conditions were established when shares were issued to three employees involving their rights to their shares (dealing with non-compete language, etc.) that was not part of the 1997 Agreement. As such, the responses on this issue were not necessary completely incorrect. Likewise, regarding the request involving notice to Postma of a meeting on May 31, 2018, the request was sufficiently vague that the response was not necessarily completely inaccurate in that the "meeting" was not completely identified. For instance, it was not referenced as a board meeting, Shareholder meeting or any other type of specific meeting. It is also possible that Kats, Brenneman, and Vander Vliet had more than one meeting during the time frame on or about May 31, 2018. Accordingly, the Court declines to impose any sanctions under rule 1.517(3)(b) at this time.

Postma contends the court's reliance on the defendants' "colorable claim" is contrary to the rule. He argues the court thus erroneously applied the rule and the defendants had no reasonable basis to deny the requests for admissions.

Because there is to be a hearing for sanctions for rule 1.981(7) (bad faith affidavit attorney fees), we vacate the court's conclusion under rule 1.517(3)(b) and remand for the court to reconsider the motion using the correct "reasonable grounds" standard and determination of appropriate sanctions, if any.

**IV. Conclusion.**

We affirm on appeal. We treat the cross-appeal as a petition for writ of certiorari, grant the petition, and sustain the writ in part.

**AFFIRMED ON APPEAL; WRIT SUSTAINED IN PART AND REMANDED.**